The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 28, 2022

**2022COA82**

**No. 18CA2319, *People v. Lancaster* — Crimes — Colorado
Victim and Witness Protection Act of 1984 — Bribing a Witness
or Victim — Official Proceeding**

As a matter of first impression, a division of the court of
appeals interprets the phrase "any official proceeding" in the bribery
statute, section 18-8-703(1), C.R.S. 2021, and holds that it is not
limited to existing proceedings but also encompasses future
proceedings.  The division concludes sufficient evidence supports
the defendant's bribery conviction even though the bribery occurred
before charges were filed.  The division similarly finds sufficient
evidence to support the sexual assault – victim incapable conviction
and discerns no abuse of discretion in the trial court's admission of
prior act evidence.  The judgment is affirmed.

COLORADO COURT OF APPEALS 2022COA82

Court of Appeals No. 18CA2319
Jefferson County District Court No. 06CR1949
Honorable M.J. Menendez, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Larry Gene Lancaster,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE FREYRE
Fox and Lipinsky, JJ., concur

Announced July 28, 2022

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Leslie A. Goldstein, Alternate Defense Counsel, Steamboat Springs, Colorado,
for Defendant-Appellant

¶ 1     As a matter of first impression, we are asked to interpret the meaning of "official proceeding" in the bribery statute, § 18-8-703(1), C.R.S. 2021, and its temporal proximity requirement to the criminal conduct.  Does the bribery statute require that a defendant offer, confer, or agree to confer a benefit to a victim, witness, or person only *after* official proceedings have been initiated, as Larry Gene Lancaster contends?  We answer that question no and hold that bribery occurs when a defendant offers, confers, or agrees to confer any benefit to someone he believes is to be called, or who *may* be called, to testify in any official proceeding covered by section 18-8-501(3), C.R.S. 2021, with the intent to influence such testimony.

¶ 2     Lancaster appeals the judgment entered after a jury convicted him of sexual assault on a child less than fifteen, unlawful sexual contact of a child, sexual assault (victim incapable of appraising the nature of his conduct), contributing to the delinquency of a minor, and two counts of bribery.  We affirm.

I.     Factual Background

¶ 3     During his seventh-grade year, thirteen-year-old J.C. met Lancaster when J.C. was shoveling snow with his friend at their

1

condominium complex. Lancaster, who lived in the same complex, asked J.C. and his friend to shovel snow from around his car and patio and the boys agreed. After they finished shoveling, Lancaster invited the boys inside and fed them.

¶ 4 Several months passed before J.C. returned to Lancaster's home with his friend. J.C. offered to do some household chores for Lancaster and Lancaster accepted because he had a broken leg. J.C. then continued to help Lancaster with household chores every week or every other week in exchange for money.

¶ 5 During his eighth-grade year, J.C., now fourteen, began using drugs and alcohol. He also frequented Lancaster's home more often to make money to support these habits. Sometimes J.C. would help clean and, at other times, he would hang out, watch television, or attend a party at Lancaster's home. During one party, J.C. asked Lancaster if he could have an alcoholic drink and Lancaster gave one to him. Over time, the two increased the frequency of their drinking together, as well as the amount of alcohol they drank.

¶ 6 Near the end of the summer before ninth grade, J.C. and Lancaster were drinking and putting away clothes in Lancaster's

2

bedroom when J.C. saw some pornographic videos on top of the television. Lancaster noticed that J.C. saw the videos and put one in the DVD player. As they watched, Lancaster rubbed J.C.'s penis, first over the clothing and then under it. Lancaster was interrupted by a knock at the door or a phone call, which he answered. Shocked at what had occurred, J.C. rushed to the bathroom and closed the door. Shortly thereafter, Lancaster opened the bathroom door and asked if J.C. was "going to finish what he had started." J.C. then masturbated to ejaculation while Lancaster watched. After the sexual encounter, J.C. told Lancaster that he needed to go home. Lancaster gave J.C. $20 and said, "Don't tell anyone what happened or I'm going to jail."

¶ 7    J.C. continued to frequent Lancaster's home after the encounter because he was "getting drunk for free" and he "felt like it was a safe place to go to at the time." He started drinking "more and more" and the sexual abuse progressed. J.C. went to Lancaster's home nearly every day and, after he drank two or three mixed drinks, Lancaster performed oral sex on him while he watched pornography. Before performing oral sex, Lancaster closed the blinds and locked the door while J.C. undressed in the

3

bathroom. Lancaster also undressed and waited for J.C. in the bedroom. On one or two occasions, Lancaster asked J.C. to touch his penis, so J.C. masturbated him. After each sexual encounter, Lancaster gave J.C. money.

¶ 8 The next summer, Lancaster had a party, and J.C. drank alcohol throughout the day. After everyone left, J.C. and Lancaster continued drinking and raced to see who could finish his drink first. At this point, J.C. had ingested ten to twelve drinks, was drunk, could not stand or walk a straight line, and could not see straight. He "was drunk enough to where [he] just agreed to anything and, to a certain extent, [he] didn't know where [he] was at."

¶ 9 When Lancaster began shutting the blinds and locking the doors, J.C. "knew what was going to happen." He went to the bathroom to undress and then entered the living room, where Lancaster performed oral sex on him. Partway through, Lancaster stopped and asked if he could "fuck" J.C., and J.C. said yes. Lancaster then retrieved a condom and lubricant before anally penetrating J.C. When the pain became too great, J.C. got up and

told Lancaster that he had to go home. J.C. then walked home and went straight to bed.

¶ 10    The next morning, J.C. was still in pain and felt "disgusted" and "absolutely violated." Lancaster repeatedly called J.C., asking him to come over but J.C. said no. J.C. then heard a knock at the door, and it was Lancaster. Lancaster handed him $50 and said, "Here's for last night. Don't tell anyone or I really will go to jail."

¶ 11    A few days later, J.C. returned to Lancaster's home and their relationship continued for about a month and a half as it had before the anal sex incident. Lancaster would perform oral sex on J.C. and J.C. would do household chores for money. But J.C. stopped seeing Lancaster after he went into alcohol and drug treatment. Six months into his sobriety, J.C. told his outpatient counselor about the sexual abuse and he subsequently reported the abuse to the police.

¶ 12    The jury convicted Lancaster of sexual assault on a child less than fifteen, unlawful sexual contact of a child, sexual assault (victim incapable of appraising the nature of his conduct),

contributing to the delinquency of a minor, and two counts of bribery.[1]

## II.    Sufficiency

¶ 13    Lancaster first contends that the prosecutor produced insufficient evidence to support his convictions of sexual assault (victim incapable of appraising the nature of his conduct), and bribery.  He argues that insufficient evidence showed that J.C. was incapable of appraising the nature of his conduct when he agreed to engage in anal sex with Lancaster.  He also argues there was insufficient evidence to support his bribery convictions because Lancaster gave J.C. money in exchange for his silence before any official proceedings were initiated.  We address and reject each contention.

### A.    Standard of Review

¶ 14    In assessing the sufficiency of the evidence to support a conviction, we employ the substantial evidence test to determine whether the evidence, viewed as a whole, and in the light most

---

[1] The State also charged Lancaster with sexual assault on a child less than fifteen for conduct against J.C.'s younger brother but the jury acquitted him on that charge.

favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). We must give the prosecution the benefit of every reasonable inference that may fairly be drawn from the evidence. *People v. Duran*, 272 P.3d 1084, 1090 (Colo. App. 2011).

¶ 15 "The pertinent question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clark*, 232 P.3d at 1291. The jurors are entrusted with resolving the weight and credibility of the evidence. *People v. McGlotten*, 166 P.3d 182, 188 (Colo. App. 2007). And we do not sit as the thirteenth juror to reassess credibility or to reweigh the evidence presented to the jury. *Clark*, 232 P.3d at 1293.

¶ 16 We review de novo questions of statutory interpretation. *People v. Perez*, 2016 CO 12, ¶ 8. When construing a statute, our primary task is to ascertain and give effect to the General Assembly's intent. *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007). We begin with the statute's plain language. *People v. Huckabay*, 2020 CO 42, ¶ 13. "If the language is clear and

unambiguous on its face, we simply apply it as written and will not resort to other interpretive aids." *Id.* We "respect the legislature's choice of language," and we "do not add words to the statute or subtract words from it." *Turbyne*, 151 P.3d at 567-68.

### B. Sexual Assault – Victim Incapable

¶ 17 Section 18-3-402(1)(b), C.R.S. 2021, provides that a person commits sexual assault if he "knowingly inflicts sexual intrusion or sexual penetration on a victim" and "knows that the victim is incapable of appraising the nature of the victim's conduct." A victim is incapable of appraising the nature of his conduct in a situation where "a victim is cognitively unable to appreciate h[is] conduct; in other words, it involves a victim who simply cannot understand what []he is doing." *Platt v. People*, 201 P.3d 545, 548 (Colo. 2009).

¶ 18 Lancaster contends that J.C. was not so drunk as to not understand what was happening or to not remember the details of the sexual assault. He points to J.C.'s detailed testimony about the sexual assault as evidence that he was "oriented to time, place[,] and sequence of events."

¶ 19    Contrary to Lancaster's contention, we conclude that the prosecution presented sufficient evidence that J.C. was incapable of appraising the nature of his conduct, based on the following evidence:

- J.C. was fifteen at the time of the sexual assault and weighed approximately 95 to 100 pounds.

- He drank ten to twelve mixed drinks throughout the day.

- He testified that he could not stand up, walk a straight line, or see straight.

- He testified that he was so drunk that he "just agreed to anything and, to a certain extent, [he] didn't know where [he] was at."

- After all the other guests had left, Lancaster raced J.C. to see who could drink the mixed drinks faster.

*See People in Interest of G.B.*, 2018 COA 77, ¶¶ 15-16 (although the victim testified that she "knew what was going on," there was sufficient evidence that she was incapable of appraising the nature of her conduct).

¶ 20    Viewing this evidence in the light most favorable to the prosecution, we conclude that the jury could determine beyond a

9

reasonable doubt that Lancaster knew that J.C. was incapable of appraising the nature of his conduct.

## C. Bribery

¶ 21 Lancaster also contends that there was insufficient evidence to support his bribery convictions because official proceedings had not yet been initiated at the time he gave J.C. money to attempt to buy his silence. The parties do not dispute that official proceedings had not been initiated at the time of the alleged bribe. The People, however, contend that an official proceeding does not need to be initiated before the bribery statute applies, reasoning that a defendant who offers, confers, or agrees to confer any benefit to a witness, victim, or person with the intent to influence their testimony in pending or future proceedings constitutes bribery.

¶ 22 As relevant here, a person commits bribery of a witness or victim if he

> offers, confers, or agrees to confer any benefit upon a witness, or a victim, or a person he or she believes is to be called to testify as a witness or victim in *any official proceeding* . . . with intent to . . . [i]nfluence the witness or victim to testify falsely or unlawfully withhold any testimony.

§ 18-8-703(1)(a) (emphasis added).

10

¶ 23    In *People v. Yascavage*, our supreme court considered whether the tampering statute, § 18-8-707, C.R.S. 2021, "requires that the victim or witness with whom the defendant allegedly tampered was legally summoned and whether the general assembly intended 'legally summoned' to mean 'subpoenaed' or 'subject to legal process.'" 101 P.3d 1090, 1091 (Colo. 2004). In doing so, the court interpreted the statute as a whole, including the phrase "any official proceeding." *Id.* at 1093. We find the court's analysis analogous here.

¶ 24    Similar to the bribery statute, section 18-8-707(1) provides as follows:

> A person commits tampering with a witness or victim if he intentionally attempts without bribery or threats to induce a *witness or victim* or a person he believes is to be called to testify as a witness or victim in *any official proceeding* or who may be called to testify as a witness to or victim of any crime to [do one of the following].

(Emphasis added.)

¶ 25    The court first identified the class of persons the legislature intended to protect — witnesses and victims. *Yascavage*, 101 P.3d at 1093-94. Because the definitions of "witness" and "victim" apply

11

to a broad class of persons, so too does the protection from tampering. *Id.* at 1094; *see also* § 18-8-702(2), C.R.S. 2021 (definition of "[w]itness"); § 18-8-702(1) (definition of "[v]ictim").

¶ 26     Next, the supreme court found that the nexus between the protected class of persons and the harm to be avoided — "obstruction of justice" — "is that the defendant must believe the person is or will be a participant *in any official proceeding.*" *Yascavage*, 101 P.3d at 1094. Thus, tampering "occurs when a defendant intentionally attempts to interfere with someone he believes is to be called, or who *may* be called, to testify in any proceeding covered by section 18-8-501." *Id.* The court did not limit the application of tampering only to official proceedings that had already been initiated. *Id.*

¶ 27     As in *Yascavage*, we must view section 18-8-703 in its entirety. Applying *Yascavage*'s analytic framework, we conclude that the bribery statute is intended to protect not only witnesses and victims, but also persons whom a defendant believes may be called to testify. Thus, the class of persons protected by the bribery statute is broader than that of the tampering statute. And the class of protected persons is not limited to those designated as witnesses

12

or victims after an official proceeding has been initiated, but also includes those with knowledge of a crime who may be called in a future proceeding. *See* § 18-8-702(2)(a) (defining a "[w]itness" as any person "[h]aving knowledge of the existence or nonexistence of facts relating to any crime").

¶ 28    We next look to the phrase "any official proceeding." A defendant must believe that a witness, victim, or person will be called as a witness or victim in any official proceeding. An "official proceeding" is any

> proceeding heard before any legislative, judicial, administrative, or other government agency, or official authorized to hear evidence under oath, including any magistrate, hearing examiner, commissioner, notary, or other person taking testimony or depositions in any such proceedings.

§ 18-8-501(3).

¶ 29    However, neither the bribery statute, nor the definition of "official proceeding," contains an express time limitation on "any official proceeding." We therefore conclude that the phrase "any official proceeding" is not limited to pending official proceedings and includes future proceedings. Accordingly, a person commits bribery by offering, conferring, or agreeing to confer a benefit to a witness,

13

victim, or person that he, she, or they believes will be called or may be called to testify, with the intent to influence such testimony. This is consistent with our supreme court's interpretation of the same phrase in the tampering statute.

¶ 30 Further, a majority of jurisdictions that have considered this issue have also concluded that whether a defendant may be convicted of bribery does not depend on whether an "official proceeding" has been initiated, but instead depends on whether the defendant believes the witness or victim is or will be participating in a pending or future official proceedings. *See Briggs v. State*, 226 So. 3d 59, 62 (Miss. 2017); *State v. Gray*, 258 P.3d 242, 246 (Ariz. Ct. App. 2011) (citing *State v. Ferraro*, 198 P.2d 120, 121-22 (Ariz. 1948)); *Barnette v. State*, 855 So. 2d 1129, 1134-35 (Ala. Crim. App. 2003); *Penn v. Commonwealth*, 687 S.W.2d 135 (Ky. 1985).

¶ 31 Here, Lancaster gave J.C. money after sexually assaulting him and asked him not to tell anyone or he would go to jail. Viewing this evidence in the light most favorable to the prosecution, we conclude that a reasonable jury could conclude that Lancaster believed that J.C. would be called to testify in a future criminal

14

proceeding, and that he gave J.C. the money to influence his future testimony.

### III. Prior Acts Evidence

¶ 32    Last, Lancaster contends that the trial court erroneously admitted prior act evidence under CRE 404(b) and section 16-10-301, C.R.S. 2021, because that evidence was too dissimilar and remote in time to be logically relevant to this case, its prejudicial effect substantially outweighed its minimal probative value, and it was insufficient to establish a pattern as alleged by the prosecution. We disagree.

### A. Prior Act

¶ 33    In 1990, eighteen-year-old M.O. met Lancaster while M.O. was working across the street from Lancaster's employer and the two became friends. One day, Lancaster invited M.O. over to eat pizza, watch movies, and stay the night. Lancaster also offered to drive M.O. to Lancaster's home and take him back to work the following morning. M.O. agreed. When they got to Lancaster's home, another young man was there, and they all drank beer together. M.O. became tired and fell asleep on the couch and the other young man left.

15

¶ 34    Later in the evening, M.O. woke up to Lancaster performing oral sex on him.  M.O. rolled over and said, "[W]hat the fuck is going on?"  Lancaster responded that he "thought [M.O.] wanted it" and M.O. made it clear that he did not.  Lancaster then went to his bedroom and slammed the door.  M.O. stayed awake until Lancaster took him back to work the following morning.

¶ 35    M.O. told his girlfriend what had happened, and she advised him to tell his mother.  He subsequently reported the sexual contact to the police.  Detective Scott Buckley asked him to place a "pretext" phone call to Lancaster to talk about the sexual contact and he agreed.  During the call, M.O. asked Lancaster, "[W]hy did you wait till I was asleep instead of when I was awake?  Did you think that's easier to break it to me or something?"  And Lancaster responded, "Yeah."

¶ 36    Based on that phone call, Buckley interviewed Lancaster.  Lancaster told Buckley that, when he noticed M.O. falling asleep, he asked M.O. whether he preferred to sleep in bed with him or on the couch.  M.O. said the couch.  He laid a blanket over M.O. and patted him over the groin area.  He said that M.O. "wiggled a little bit" and he took that as a sign that M.O. liked it.  He then started

16

rubbing M.O.'s penis over the blanket. When M.O. became erect, he took M.O.'s penis out of his pants and started performing oral sex on him. After about two minutes, M.O. woke up and said no. Lancaster asked M.O. if he was sure because it looked like M.O. was enjoying it. M.O. again responded no and Lancaster stopped.

### B. Standard of Review and Applicable Law

¶ 37    "Trial courts are accorded substantial discretion when deciding whether to admit evidence of other acts." *Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009). Therefore, we review a trial court's decision to admit other acts evidence for abuse of discretion and will only disturb the ruling if it was "manifestly arbitrary, unreasonable, or unfair." *Id.*

¶ 38    If defense counsel timely objects to the evidence on the grounds raised on appeal, we review for harmless error. *Lehnert v. People*, 244 P.3d, 1180, 1185 (Colo. 2010). An error is harmless if it does not "substantially influence[] the verdict or affect[] the fairness of the trial." *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 39    Generally, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show that the

person acted in conformity with the character trait on a particular occasion. *People v. Rath*, 44 P.3d 1033, 1038 (Colo. 2002); *see also* CRE 404(b). However, such evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2); *Yusem*, 210 P.3d at 463.

¶ 40 In sexual assault prosecutions, other act evidence is admissible for any purpose other than propensity, including,

> [r]efuting defenses, such as consent or recent fabrication; showing a common plan, scheme, design, or modus operandi, regardless of whether identity is at issue and regardless of whether the charged offense has a close nexus as part of a unified transaction to the other act; showing motive, opportunity, intent, preparation, including grooming of a victim, knowledge, identity, or absence of mistake or accident; or for any other matter for which it is relevant.

§ 16-10-301(3).

¶ 41 Before admitting evidence under CRE 404(b) and section 16-10-301, the trial court must perform an analysis under People v. Spoto, 795 P.2d 1314 (Colo. 1990), and determine whether (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the intermediate

inference that the defendant was acting in conformity with his or her bad character; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *People v. Jones*, 2013 CO 59, ¶ 14; *Spoto*, 795 P.2d at 1318. The court must also determine, by a preponderance of the evidence, that the other act occurred, and that the defendant committed the act. *People v. Garner*, 806 P.2d 366, 373 (Colo. 1991).

## C.    Analysis

¶ 42    We first reject Lancaster's contention that the prosecutor failed to provide a precise evidential hypothesis for the admission of the prior act evidence. *See Rath*, 44 P.3d at 1039 ("[T]he prosecution must articulate a precise evidential hypothesis by which a material fact can be permissibly inferred . . . .").

¶ 43    At the first hearing on the prosecutor's motion to admit prior act evidence, the trial court deferred ruling on the motion and ordered the prosecutor to file a supplemental motion articulating "a precise evidential hypothesis as to which element the prior bad acts are relevant to." However, neither the supplemental motion nor the trial court's ruling granting the motion are in the record before us. Therefore, we must presume that the prosecutor complied with the

trial court's order and articulated a precise evidential hypothesis for the admission of the prior act evidence. *See People v. Ullery*, 984 P.2d 586, 591 (Colo. 1999) ("If the appealing party fails to provide us with such a complete record, we must presume the correctness of the trial court's proceedings.").

¶ 44    We now turn to the admissibility of the evidence and first consider whether the prior act evidence relates to a material fact. *See Spoto*, 795 P.2d at 1318 (defining a material fact as one that is "of consequence to the determination of the action" (quoting CRE 401)). We conclude that M.O.'s age, Lancaster befriending M.O. before inviting him to his home, Lancaster providing M.O. alcohol before initiating sexual contact, and Lancaster beginning the sexual contact by first touching M.O.'s penis over his pants and progressing to oral sex are probative of Lancaster's motive, common plan, and knowledge. Because these are "well-accepted methods of proving the ultimate facts necessary to establish the commission of a crime," we discern no abuse of discretion in the trial court's finding on *Spoto*'s first prong. *Rath*, 44 P.3d at 1040; *see also People v. Cousins*, 181 P.3d 365, 371 (Colo. App. 2007) ("Proof of

20

other acts can be introduced to establish motive as a cause of the charged crime.").

¶ 45     We similarly conclude that the prior act evidence is logically relevant and makes it more likely that Lancaster acted knowingly and for purposes of sexual arousal, gratification, or abuse when he touched J.C.'s penis. *See Spoto*, 795 P.2d at 1318 (defining logical relevance as evidence having "any tendency to make the existence of [the material fact] more probable or less probable than it would be without the evidence" (quoting CRE 401)). As with J.C., M.O.'s testimony that Lancaster befriended him before inviting him to his home, gave him alcohol, and waited for the other guest to leave before sexually assaulting him demonstrates a common plan or scheme. *See Rath*, 44 P.3d at 1040 (concluding that evidence of prior acts was logically relevant to prove a material fact because the incidents "were part of a pattern of behavior . . . demonstrating a method for committing crimes like those for which [the defendant] was on trial"). Although there are some differences in the circumstances surrounding each offense, namely the length of time of sexual abuse, "it is not essential that the means of committing the other crimes replicate in all respects the manner in which the

crime charged was committed." *People v. McKibben*, 862 P.2d 991, 993 (Colo. App. 1993). In both cases, Lancaster befriended male teenagers and waited until they had consumed alcohol and were in a vulnerable state to sexually assault them.

¶ 46 Additionally, evidence of a defendant's motive is probative of whether the defendant possessed the requisite mental state — here, knowledge. M.O.'s testimony helped explain Lancaster's decision to befriend J.C., to spend time with J.C. alone in his home, and to offer J.C. alcohol. The prior act evidence was, therefore, probative of Lancaster's intent and knowledge. Thus, we discern no abuse of discretion in the court's findings regarding *Spoto*'s second prong.

¶ 47 We next conclude that the prior act is logically relevant independent of the bad character inference prohibited by CRE 404(b). This third step "does not demand the absence of the bad character inference but merely requires that the proffered evidence be logically relevant independent of that inference." *People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994). Although we acknowledge that the prior act evidence undoubtedly injected some bad character evidence into the trial, the crucial question is

whether a jury could reasonably consider that evidence for a proper purpose, independent of this bad character inference.

¶ 48    Here, the factual similarities between the cases create the strong inference that Lancaster had a common plan and motive — that he looked for an opportunity to be alone with teenage males, that he made the males vulnerable by giving them alcohol, and that he did so with the intent to sexually assault them. *See People v. Delgado*, 890 P.2d 141, 143-44 (Colo. App. 1994) (explaining that a common plan "does not rest on the prohibited inference that [a] defendant committed the crime charged because he was acting in accordance with a generally bad character" but rather is relevant because it shows a defendant's "tendency to commit an act in a particular way").

¶ 49    We are not persuaded otherwise by Lancaster's argument that the prior act was too remote in time to be logically relevant to a material fact independent of bad character. When enacting section 16-10-301, the General Assembly found that "evidence of other sexual acts is typically relevant and highly probative, and it is expected that normally the probative value of such evidence will outweigh any danger of unfair prejudice, *even when incidents are*

*remote from one another in time.*" § 16-10-301(1) (emphasis added); *see also Adrian v. People*, 770 P.2d 1243, 1245-56 (Colo. 1989) (remoteness is only one factor that a court should consider in determining the probative value of prior act evidence); *People v. Shores*, 2016 COA 129, ¶ 48 (finding no abuse of discretion in the admission of other act evidence that occurred nearly two decades prior).  And, we are not persuaded by Lancaster's assertion that a single prior act is insufficient to demonstrate a common plan.  When, as here, a defendant takes multiple steps during a single prior act, the steps together are sufficient to demonstrate a common scheme or plan.  *See Delgado*, 890 P.2d at 144.  Therefore, we conclude that the jury could consider the prior act evidence for its proper purpose, independent of the bad character inferences and, thus, that *Spoto*'s third prong is satisfied.

¶ 50    Finally, *Spoto*'s fourth prong requires us to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under CRE 403.  Because prior acts always have the potential for prejudice, it is only unfair prejudice that substantially outweighs probative value that requires exclusion.  *Yusem*, 210 P.3d at 467 (citing *Masters v. People*, 58

24

P.3d 979, 1001 (Colo. 2002)).  Factors relevant to a CRE 403 analysis include (1) the importance of the fact of consequence for which the evidence is offered; (2) the strength and length of the chain of inferences necessary to establish the fact of consequence; (3) the availability of alternative means of proof; (4) whether the fact of consequence is disputed; and (5) the potential effectiveness of a limiting instruction.  *Id.* at 467-68.

¶ 51    Weighing these factors, and affording the evidence its maximum probative value, we reject Lancaster's argument that the circumstances of each case were so disparate in nature as to be relevant to only bad character.  Instead, for the reasons described, we conclude the prior act evidence was highly probative of Lancaster's motive, common plan, and knowledge for the reasons stated above.

¶ 52    We further reject Lancaster's contention that Detective Buckley's testimony regarding the "pretext" call improperly bolstered M.O.'s testimony.  Buckley did not testify about the veracity of M.O.'s testimony; he only testified about his interviews with M.O. and Lancaster.  He also provided additional information

25

about the pretext phone call that triggered the interview with Lancaster.

¶ 53     Finally, the trial court read a limiting instruction before J.C.'s testimony, and it provided the jury with a written limiting instruction before deliberations.  Absent contrary evidence, we presume the jury understood and followed these instructions. *People v. Moody*, 676 P.2d 691, 697 (Colo. 1984).

¶ 54     Accordingly, we discern no abuse of discretion in the court's admission of the prior act evidence.

IV.    Conclusion

¶ 55     The judgment is affirmed.

JUDGE FOX and JUDGE LIPINSKY concur.